I'll call the third case, Maria Pena et al. v. Rio Grande City. Good morning, Your Honors, and may it please the Court. My name is Taylor Saez-Maeda, and I represent the appellant. Today we seek justice for a 17-year-old who was tased after running away from her father during an argument. The police, responding to a domestic disturbance, came out and tased her as she was running. She fell to the ground and suffered numerous burns, cuts, and injuries. No reasonable officer could have thought that that was reasonable. We respectfully request that this course be remanded as summary judgment was improper. There are material disputes of fact in the record, and there should be no qualified immunity in this case, as tasing a nonviolent, non-criminal, non-threatening individual is a clearly established violation of the Fourth Amendment. There are two prongs to the qualified immunity analysis. The first is whether it's clearly established that there was a right to be violated. The second is whether or not there was a constitutional violation. As to the first prong, it is clearly established that tasing a nonviolent, non-criminal, non-threatening individual is established in this circuit. This is established in Newman v. Gergery in 2012, which is two years before the facts of this case. There, this court held that tasing a nonviolent, non-criminal, non-threatening individual is a clearly established right. This court has reaffirmed this holding in Aughton v. City of Baytown and Massey v. Warren. Can I go back? I'm just going to ask you to keep your voice up. Oh, I apologize. Can I go back to you? You used the term a domestic disturbance, so my question is really one of fact. As I understood from the briefs, the father of the victim of the tasing actually brought her to the police station because there had been a prior conversation about the young lady needing some exposure to law enforcement to perhaps scare her into better conduct. Is that correct? That is correct, Your Honor. Okay. So when we say, and I realize domestic disturbance encompasses a lot of conduct, she's there with her father, and then these officers and perhaps others came out and wanted her to leave the car. Is that right? Yeah, so there's a dispute as to what went on. One of the officers, Officer Vela, who is not a party to this suit, allegedly saw them arguing outside the vehicle. However, that's disputed in the record as the father and Ms. Pena state that they were in the car, and there's a dispute as to what went on. Okay, and I just want to understand that this encounter with law enforcement was not the result of any unlawful activity or crime being committed by the person who was tased. Is that correct? At least not when they first encountered each other. Correct. There's no evidence that there was any disorderly conduct or resisting arrest. Ms. Pena was not committing any crime when she was tased. She was a lawful citizen, and they tased her as she was running away. Well, Counselor, I do think you may not be overstating it, and you may be making a different point, but one of the significant questions in this case is would all reasonable officers objectively know that she had not committed some offense for which she was trying to escape? And you do have the events within and immediately outside the car that could amount to assault or resisting arrest or whatever else that might have occurred. You can certainly address your reaction to my comments, but a question I have is what are the facts disputed otherwise? What is the evidence that is in this record to say one way or the other of what Solis and Salinas knew about whether she had or had not committed a crime? All they knew when they were responding to the scene that there was a family disturbance or a domestic disturbance. Now, are you talking about preceding all of this? Are you talking about the struggle between the father and the young woman in the car and outside the car? Correct. All they knew because they were called by Officer Vela. So Officer Vela was first on scene. He's not party to this. Okay. I mean, getting back, I just want to make sure you're not talking about the concern the father had that predates these events. No. When you say domestic disturbance, you're talking about what happened between the daughter and the father there. Correct, Your Honor. I apologize. No, no. I mean, you explained it to Judge Engelhardt. Now you've got to explain it to me again. I wasn't sure that was what you meant by that, that those events were what you meant by that phrase. But those two officers at least saw, did they not, some of what was going on between Vela, the father, and the daughter? They saw that there was some sort of argument, but that's not necessarily enough to rise to immediately tasing her when she's running. That's assuming something that whether or not she was committing a crime, she could have been fleeing, any sort of instance. It's putting assumptions on what went on and just assuming that she was a perpetrator or something of that nature. Well, do you agree or not that an issue that is before us and before the district court is whether all reasonable officers would have known that she had not committed some offense? And if that is a proper issue, what's the evidence on that? Yes, Your Honor, that is an issue whether or not they would have reasonably assumed that she was committing a crime. Ms. Pena has stated as well as her father that she never touched any officer, that she was never resisting at all or kicked any officer. However, the other officers dispute that they saw some sort of argument, that they saw something else. There's a dispute in the record here as to what exactly went on. And it's not clear that that should have been resolved on summary judgments. Was she actually ever charged with anything? She was booked for resisting arrest, and that was it. What happened to that charge? It was dismissed. There's nothing further that went on with that. As a result, it's clearly established that teasing a nonviolent, noncriminal, nonthreatening individual is clearly established in this circuit. What is clearly established? I didn't quite hear that. It's a nonviolent, noncriminal, nonthreatening individual. That's been clearly established in Newman v. Gerdry in 2012. So this was two years before the facts of this case. Ms. Pena wasn't committing a crime. She wasn't threatening any officer, and she wasn't evading arrest. She wasn't being detained for any sort of crime at the scene of the incident. The officers only tased her because it was for her own safety. All the officers in the record alleged that she was running into the road, and they thought that that was the reason as to why she should have been tased. Well, when we look at this objectively, not what was in the mind of these particular officers, and you can tell me that's the wrong standard, but if it is, it seems to me that we're here on summary judgment, correct? Correct. And so one of the questions is are there enough facts disputes about this to justify the decision? But regardless, insofar as what we're looking for is if the officers had some basis, if some or at least one reasonable officer might have had a basis, objectively to believe she committed some sort of misdemeanor in the altercations, the physical activities that occurred, what do you say on what is or is not clearly established about whether somebody could be hit, struck with a taser for trying to escape from commission of a misdemeanor? Your Honor, it's not clear that that's the case before us. This court has ruled that tasing a fleeing felon is permissible. However, here she's not fleeing an arrest. She was fleeing an argument with her father. She's not fleeing any sort of misdemeanor. You're stating your understanding of the facts. Yeah. I'm saying if an officer looked at what happened, would all reasonable officers reach your conclusion or findings about that?  If some reasonable officers could have seen that a misdemeanor had occurred, what is the law on whether they could have used a taser on her for trying to escape from the commission of a misdemeanor? Your Honor, tasing somebody just for running away from a misdemeanor is not sufficient. They didn't use any of the other tools in their tool belt. They could have shouted to her to stop running. They could have used any other sort of method. Here they just jumped right to tasing her when she ran from the car, and that's even assuming that she was committing a misdemeanor. The officers first assumed that she was committing a misdemeanor and then proceeded that that was the best method to detain her was tasing her. Here that's not proper. This court has never held that, and this court has repeatedly held that tasing somebody for committing a minor crime is not sufficient. This was in Newman v. Gergery, Otten v. City of Baytown, and Massey v. Warren. There all three were tased after either committing no crime or potentially only as in Massey v. Warren, or I apologize, Otten v. City of Baytown, potentially committing a small minor charge. This was that just jumping to tasing somebody is not reasonable in those circumstances. Proceed. So as to Officer Salinas, it's clearly established that she should not have tased because Ms. Penny was a nonviolent, noncriminal, nonthreatening individual. Ms. Penny was not fleeing arrest. She was a normal citizen going about her business, and she wasn't threatening any officers. As to Officer Solis, who is the supervisor in this case, there must be deliberate indifference, which is judged under an objective reasonable standard. And here it's clearly established that at least gross negligence is sufficient to impugn supervisor liability on a supervisor. Here there's an affirmative act. The lieutenant stated tase, tase, tase, and that is sufficient to impugn him with supervisor liability. Is there a dispute that she was running into a hazardous situation? As I understand it, she's running away, and there's a traffic or a highway or a roadway where vehicles are driving, and she's running into that. Is there a dispute that she's entering a hazardous area where she could get seriously injured? Correct, Your Honor. There is a dispute as to that. She was running into a back alley. It was a street. It was 20 miles an hour. The officers alleged that there were cars there. However, there's disputes as to what car was there, whether there even was a car there. Additionally, there's a grassy strip on the side of the road. So she was tased far enough back from the road that they could have assumed that she could have just pivoted and turned and ran on the grass. They assumed that she was going to run in the street. Additionally, she's a 17-year-old. She could have stopped if there were any cars, and she attests to that in her testimony as well. Were your brief helpfully included, I think? Maybe I'm not giving gestures to the other side. One of the briefs had some printouts of what this area looked like. There is testimony of deposition. Otherwise, is there not? Some people did not see any car? Correct, Your Honor. Would these graphics or other evidence show that cars coming from the side on the street she was running towards would be blocked, and you couldn't see if there were any cars? The view of those would be blocked by the buildings or something like that? I apologize. Where the people were standing and seeing the young woman running, even if they didn't see any car right there, were there buildings obstructing the view of the passing traffic that she would potentially be running into? Do you recall that layout well enough to answer that? Yes, there are buildings on each side of the road when they run up. However, she was tased so far back. She was tased several car lengths, ten feet from the intersection. That means that she had plenty of time to pivot. Additionally, there's disputes as to whether there were even cars on the road, as well as there's disputes of whether or not it was a high-traffic street.  There's other testimony that states that it's a back alley and there's very few cars that drive through. It's only 20 miles an hour. It's not very fast-moving. It's not an interstate traffic that she's running into. It's a back alley that's slow-moving traffic. So as to Officer Solis, there is an affirmative act that he ordered the tasing. Additionally, their summary judgment should be denied, as there's a clear violation of the Fourth Amendment here. She was tased, and she was not committing a crime. She was not threatening any officer, and she was not evading an arrest, which satisfies the Graham factors, showing that it was objectively unreasonable to tase her. Moreover, there are material disputes of fact in the record that show that summary judgment was improper. Therefore, unless the panel has any other questions, I would respectfully reserve the remainder of our time for rebuttal. Thank you. Thank you. Hard to get here from Rio Grande City? Monday? I mean, excuse me? Is it hard to get here from Rio Grande City? It takes a while. It's circuitous. May it please the Court and Counsel. First of all, what I think you're all looking at is the elephant in the room, which is a huge elephant, is Kieselovy-Hughes, which says that it's got to be unquestionable that prior situations would determine whether the facts in this case would show that the officer should have known that what he was doing violated the law. Let me give you some of the facts and clarify some of the facts, as you were asking about, Judge Sofwick, as to what actually happened. There's the dispute as to what happened before Officer Vela showed up. Officer Vela testified that the father and the daughter were struggling and that she attempted to run into Main Street. There's Main Street, Washington Street, and Mirasoles. Mirasoles is what she refers to as the alley. It's actually a wide alley. It has cross traffic. It's not really an alley. It has a speed limit sign because it's a small street. In any case, that she tried to run into Main Street, he caught her and brought her back. Plaintiff disputes that, so that's a fact issue. What they do not dispute is that after he got her, he put her back into the car. Officer Vela showed up, and Officer Vela is attempting to figure out, sort out the circumstances. It's exactly as Judge Smith said in the original Fenya One case. Pretty questionable decision. Sorry? It's a pretty questionable opinion is what I read later. Well, there's some, there might be some issues with it, but what I was going to say is. It is the law of the case. I'm sorry? It is the law of this case. It is the law of this case, and there was something going on. Oh, I'm sorry. I'm having trouble finding that particular reference, but he said there was. Oh. There it is. In order to establish. No. He said that there was something going on. There was at least some circumstances going on inside that vehicle, and at the very least, Judge Vela. I'm sorry. Sorry. Judge Vela is a former judge down where I live. Umberto Vela, the officer who showed up on the scene, he was trying to detain her to sort out the circumstances. That's the language that Judge Smith used in the original opinion, that he was trying to sort out those circumstances. There was a backseat struggle. There was a probable cause to detain her at that point for disorderly conduct. Now, as Judge Graves joined in the per curiam opinion in Zimmerman, where there was a heated standoff in the middle of the street and the suspect ran and he was tasered, an officer is entitled to temporarily detain a suspect to preserve the status quo for safety reasons until the intentions of the suspect could be sorted out and to use reasonable force in doing so. And in that case, I believe there was a tasing in that circumstance. That was part of that opinion. Now, what happened at that point was she attempted to get out of the passenger door. She attempted to bolt. By that point, Officer Salinas and Lieutenant Solis had arrived. The area that you're talking about is basically two large walls with a street, which is Washington. It's a one-way street. City Hall and the police department were right next to it, or were at the time. She bolts out of this door. She starts running. Salinas automatically starts running after her. Now, at this point, Solis is behind Salinas. He sees her running. Solis sees a red car going to the east. Isn't that disputed, though? I'm sorry? Isn't there contrary evidence at this summary judgment stage that there was no car? Well, it's not disputed that there was no car. The only dispute had to do with the plaintiff, Ms. Pena, said she did not see a car. That does not mean everybody— And she was running at me? I'm sorry? She was running, looking that direction. Seems to me that's contrary evidence. Well, she was looking straight ahead. All she said was that she did not see a car, and she also said that she may have stopped. She may have stopped when she got to the corner. Would this car have been on Main Street, the one she's running towards? No, she's running towards Mirasoles, the small street. In other words, there's not a lot of room. Officer Solis testified, and actually Salinas also said both in their reports, that they saw the car driving towards the east pass. That one passed. And then Solis said he saw the gray SUV coming this way. Now, at this point, you've got 1001, 1002, 1003. What do you do? Because Solis did not have enough time to evaluate the situation more than that. Are you telling me that the point is they tased her to prevent her from running into traffic? For her safety. Was there any evidence that she was suicidal? No. She's a teenager. She's a teenager. Three-year-old, I'm worried about a three-year-old. I don't know about three-year-old. I may be really worried about a three-year-old running into moving traffic. But a teenager running into moving traffic, that was their concern? That was their concern, yes. Didn't they have a policy that you don't use a taser against a fleeing misdemeanor? I don't know that they had a policy. I know that they were trained on that, that generally you should not. Now, again, remember, we're looking at less than three seconds. So they were trained generally. Let me make sure. I want to see if you agree with me or not. Generally, you are not to tase a fleeing misdemeanor. Correct. That was their policy. Correct. Well, I don't know if it was their policy, but they were trained that way, in other words. Weren't they also concerned when you use a taser that you avoid tasing the person in the head? That is also part of their training, is that you should not attempt to tase them in the head. What happened here, though, with the taser? In less than three seconds that they had, Lieutenant Solis said he saw the car coming. At that point, he had a split-second judgment to make. I'm going to save her by tasing her in the back of the head. I'm sorry, what was the question? I'm going to save her by tasing her in the back of the head. Well, I don't think anybody was intending or trying to tase her in the back of the head. Nobody was thinking, I want to tase her, save her, by tasing her in the back of the head. What they wanted to do was stop her before she got a further or more significant, possibly more significant injury. The officer is working on a split- By running into track. By running into track, by getting hit by a car, and even if that car wasn't there, by running into track. You'll agree with me that the injury she got as a result of being tased was significant. I'm sorry, I can't hear you. You'll agree with me that the injury she got as a result of being tased was significant. I don't know that I'd call it significant. It was- She fell on the pavement. Well, here's what I'm saying is, you had the old qualified immunity standard under Shillingford v. Holmes and Johnson v. Morrell that talked about significant and severe injuries and stuff. I don't know that it would qualify or fall within any of those definitions. What I'm saying is that, yes, it was an injury. Yes, it was not a minor injury. Whether it was significant or whatever the classification would be, yes, she was hurt. I'm not disputing that. And what the situation here was, what you're trying to do is keep her from getting very hurt. They didn't know. They couldn't anticipate that she would get the scrapes that she got, that she would lose the two teeth that she got, that she would break her teeth when she fell. They couldn't know what it was, but they could anticipate what would happen if she got hit by a car. So if she gets hit by a car, the officer, Solis, in that split second is thinking, what can I do? What do I do? Maybe she wouldn't have been hit. You're conceding that their chief concern was not the apprehension of this fleeing person who possibly committed a misdemeanor of disorderly conduct, which resulted in a charge for resisting arrest. If you're resisting an arrest, then it begs the question, what was the arrest for? She was actually charged with disorderly conduct, resisting arrest, and two other charges. I don't remember what they were. The district attorney chose not to prosecute for whatever reason, and those charges were dismissed. It was actually four different charges, including disorderly conduct, which is what started it all. Now, the question Judge Smith had last time was, was she tased for her own safety or for the arrest? And that's why I've been talking about the arrest so much, the authority to arrest. Yes, they had the authority to arrest her, even if nothing else, just for the disorderly conduct. They could have tased her, just as they did in the Zimmerman case. At that point, they had the authority to do that. And when you're trying to second-guess an officer, trying to make a split-second decision, there is no clearly established law that says an officer cannot do that for safety purposes. If he's doing it, and you're looking at what he's thinking at the time, not necessarily what she's thinking at the time. If you're looking at what he's thinking at the time, you have to ask, was it clearly established? Would it have been okay to use the gun and shoot her in the leg to keep her from doing that? Okay, maybe we're going off tangent here, because I'm not— I'm just asking whether or not you think that would be okay. I don't know. You can say yes or no. I don't know, because I have not seen a case that talks about when an officer is entitled to qualified immunity and to what extent preexisting precedent would show that. I'm not aware of any cases that say, yes, it's okay to shoot a person in the leg while they're running. I haven't looked that up. So I can't tell you one way or the other whether that would be—I would assume not, but I don't know. What I'm trying to show or look at here is the facts known to the officer at the time, whether it's for safety purposes or because she had— there was sufficient basis to detain her or even to arrest her for disorderly conduct. Based on that language, based on those factors, the officer had at least the authority to take the action of tasing, and there's no case law prior to now that says— Let me go back to what you just said, something that—a question I was about to ask. What did the officers know at the time? I want to go back in time of just a few, maybe even less than a minute or two. Pena's father parks the vehicle on Washington Street in the slot closest to Main Street, according to the record. All right. Somehow—and my question is how did officers Salinas, Solis, and Vela come upon Ms. Pena and her father? Were they summoned out of the police station or did they just happen to be walking by and say, gee, there's some ugliness here or— Remember I mentioned the police station was right next— Right. I understand. When Vela happened to be coming out, he saw the situation, he called it in, and that's when Solis and Salinas, who were in the police department— So they had no prior contact with the father or with Ms. Pena. They just—at that time, the circumstances unfolded. They happened to be the three— Who showed up. Okay. All right. And actually, to clarify something else, she did not fall a few car lengths before the street. Because of that split-second action, when Salinas tased her, she fell right next to the stop sign, and yes, there were pictures in both of our briefs that show this whole area. There are circles next to the stop sign where she testified she fell, which was, again, the building is maybe two feet from— Actually, no, the building abuts the Mira Solis Street. It's on the side of it. There's not a lot of room beyond that if she had not fallen right there. She did not fall clearly far back. This is not a situation, for example, like in Colby Carson, where they had an opportunity to warn her to take action, to say, if you don't get down, I'm going to shoot or I'm going to take action. There was not enough opportunity for that. At the moment she got tased, she fell right next to the stop sign, which was right next to Mira Solis Street, right in front of Mira Solis Street, and there was no indication that she actually would have stopped. Again, we're looking at the standards set out in Saussure, saying the reasonableness of the appropriate level of force has to be judged from the on-scene perspective of the officer. Graham V. Conner talks about you have to judge it from the perspective of a reasonable officer without the benefit of 20-20 hindsight. Then Saussure again says a mistaken, though reasonable, belief that she may have been struck by a passing vehicle would justify using more force than in fact may have been needed is justified. And I think Zimmerman agreed that it was not clearly established that pursuing a suspect fleeing to avoid an investigatory stop and applying a single taser shock would be objectively unreasonable. There was a question originally about whether it was more than one taser shock. Everybody agreed it was just one, and she fell down immediately and no other action was taken after that. These circumstances, no question, I don't think anybody's going to dispute, these circumstances are unprecedented in case law. And if there's no precedent to establish that the officer should have known not to do this, then Keesler says he's entitled to immunity unless the existing precedent squarely governs the specific facts at issue, places a statutory constitutional question beyond debate, and that every official, reasonable official, would have understood that what he's doing violates that right. There's no prior cases that talk about tasing a suspect to prevent a higher risk of injury. There are none. And that's why we refer to the cases on whether it's reasonable to suspect a fleeing, I'm sorry, to tase a fleeing suspect when you're talking about arrest. All the cases talk about the arrest circumstance, and that's why I mention the aspect of there was a basis to arrest her and there was a basis to detain her. Let me ask, the district court did rule on both. Did she not, both that it was not objectively unreasonable to tase her as a misdemeanor running? This is a qualified immunity case, is it not? Yes, Your Honor. Grant qualified immunity district judge. There was not firmly established she couldn't tase somebody for fleeing from a misdemeanor and it wasn't firmly established she couldn't tase somebody to save them from causing even worse injury. She did make both of those rulings, the district judge? I'm not sure I understood you, but I think what you're saying is she ruled both on the merits of the Fourth Amendment violation and on the qualified immunity issue. And she ruled on qualified immunity on two bases, both for stopping a misdemeanor suspect from escaping and to keep her from worse injury. Yes, Your Honor, I believe she did. As I was mentioning a while ago, Colby Carson was talking about officers had the time and opportunity for warning a suspect with a gun prior to shooting but did not. In this case, what happened was Lieutenant Solis yelled, taser, taser, taser. Now, that had two points to it. One was to instruct the officer, but the second was to warn the suspect that they will be tased. That is the way they are trained is before you apply it, you order, you notify them. You say, taser, taser, taser, which is an instruction to the person, you're going to get tased if you don't stop. Now, like I said, all this happened. Are you saying two words or one? Is it taser? You know, I'm not sure. Honestly, I'm not sure. The record has showed both. All we know is Lieutenant Solis said, taser, taser, taser. Now, is that tase her or taser? My understanding is Lieutenant Solis said it's one word, taser, taser, taser. But I wondered the same thing, whether it was one word or two. So it was an instruction to the other officers and it was a warning? At the same time. Basically, what you have is Pena is running away. Solis sees the cars passing on Mira Solis. He perceives a threat to Pena. Solis orders the taser, and Salinas fires her taser. Those are the facts. I don't think the facts are disputed. That's a classic example of why officers are entitled to qualified immunity. As the court again said in Cole, and I think it was in the majority opinion, although she may have disputes as to what she was thinking, despite the many red flags listed by the dissents as known to others, only those known to Hunter and Cassidy, which were the two officers, are relevant to qualified immunity analysis. What you all had said was what matters is what the officer is seeing and what he's perceiving at that time. The conduct viewed from the officer's perspective, that's what the Supreme Court came back with. Kingley v. Hendrickson, which came out, most of the briefing in this case, unfortunately, occurred before a lot of these cases came out. Kingley v. Hendrickson is a Supreme Court case. Counsel, it seems to me that you're certainly making some good legal points. We need to decide whether we agree with them or not, unless I understand where you're headed. One of my problems with your position is just the evidence. What went on in that car? What would a reasonable officer have seen and thought might be going on, both inside the car and as people exited it? It seems to me significant, at least as to the objectively reasonable belief that any kind of misdemeanor had occurred. Why isn't there enough dispute as to how significant this sort of interaction involving the daughter, the father, and Vela and what was physically done? Why isn't there enough there to say, at least as to stopping a misdemeanor from escaping, misdemeanant from escaping, that there's just too much genuine dispute of fact there? Well, what happened up to that, just before, I'm having trouble with the timing because I'm trying not to get into the conflict as to what happened before they were inside the car. Inside the car, at the very least, there's a struggle. What we need is what Salinas and Solis would have seen. Well, Salinas, by the time all that struggle occurred, Salinas was actually standing behind Solis. I'm sorry, Vela. Vela's inside the car, basically trying to get her. She's struggling. There's a disagreement as to whether she hit him. He says she did. She says he didn't. But at the very least, she wasn't cooperating. So he's trying to get her handcuffed and coordinated here in the car, in the backseat. Salinas... Excuse me, counsel. You're doing a good job in your demonstration, but you need to stay at the microphone. Oh, sorry. It's being recorded. I talk loud enough. Nobody ever complains they can't hear me. Salinas, meanwhile, is behind Officer Vela, but she can't do anything because he's blocking the door. He's doing all that. She's behind him, and Solis is behind her. And that's why she's over here. So when Ms. Pena runs out of the passenger side door, she's the closest one, and she gives chase. All right, counsel. Your time's up. Thank you. Thank you, Your Honor. Thank you. Your Honors, to clarify a couple of things, one, she was only charged with resisting arrest and evading arrest. She was not charged with disorderly conduct. And second, Officer Vela and her father both had talked earlier that morning, so at least Officer Vela knew of the situation that was going on. There's no evidence suggesting Salinas or Solis would have known any of that, correct? No, there's no evidence. They could have, but there's nothing in this record to suggest that. There's nothing in the record, correct, Your Honor. All right. Regarding the intersection traffic. Who shouted Taser, Taser? Officer Solis did. Or Lieutenant Solis, I apologize. Regarding the intersection, when she came up on the intersection, she was on the right side as she fell near the stop sign, and any traffic coming that her way would have been visible from the street just based off of the positioning of where she fell on the street. Additionally, Taser is not a warning. This is in the record at 1109. Solis was telling, was giving the command. He admits that it was a command to Officer Salinas. And then just to reiterate, the charges were on page 1160 of the record. What was that page? 1160 in the record. Where is the detention report? And then on page 736 and to 37 is where Bailiff states that he talked with the father earlier that morning. Unless there are any further questions. Yes, counsel, let me ask you. If we were to agree with your position, qualified immunity would become an issue for the jury in this case. Is that correct? In other words, the jury would be instructed under the pattern instructions as to the application of qualified immunity, and then the jury can sort out the facts and applying the instruction as given, make a determination then as to whether or not qualified immunity applies. Is that right? The jury would decide the facts, Your Honor. The question of law would be decided by the judge, I believe, Your Honor. You don't think there would be a line on the jury verdict form that would say yes or no as to qualified immunity? That's not my understanding of that. I would understand that qualified immunity would be decided by the judge, but I could be wrong on that. I apologize. Unless there are any further questions. Thank you. Stay there just a moment. I thank all of you, both of you, for your presentation today and the assistance of the person warming the table over there and doing more than that. But we welcome you to the court as a law student. You did an excellent job, and you also had the opportunity to get asked a question that you may not have fully anticipated at the end from Judge Engelhardt that doesn't quite fit into the case yet but is relevant in our sort of considerations. But job well done, welcome, and thanks for coming. Thank you, Your Honor. You as well, Mr. Agrawal. Thank you. I'll call the last case of the morning, Thank you, Your Honor.